United States Courts
Southern District of Texas
F I L E D

**NOV 22 2019**

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | §     CRIMINAL NO.   19 cr. 795 |
| | § |
| DANNENBAUM ENGINEERING | § |
| CORPORATION | § |
| & | § |
| ENGINEERING HOLDING | § |
| CORPORATION, | § |
|       DEFENDANTS. | § |

## DEFERRED PROSECUTION AGREEMENT

Defendants Dannenbaum Engineering Corporation (DEC) and its parent

company Engineering Holding Corporation, along with their subsidiaries

(collectively, the "Company"), pursuant to authority granted by the Company's

Board of Directors, the United States Attorney's Office for the Southern District of

Texas (the "Office"), and the United States Department of Justice, Criminal

Division, Public Integrity Section (the "Public Integrity Section") (collectively, the

"Offices"), enter into this deferred prosecution agreement (the "Agreement").

## Criminal Information and Acceptance of Responsibility

1.     The Company acknowledges and agrees that the United States will

file the attached one-count criminal Information in the United States District Court

for the Southern District of Texas charging the Company with violating the Federal

1

Election Campaign Act ("FECA"), in violation of Title 52, United States Code, Sections 30109(d)(1)(D)(i) and 30122. In so doing, the Company: (a) knowingly waives its right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Texas. The United States agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2. The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. Should the United States pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial,

2

guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

### Term of the Agreement

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company agrees, however, that, in the event the United States determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the United States, in its sole discretion, for up to a total additional time period of one year, without prejudice to the United States' right to proceed as provided in Paragraphs 13-17 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period.  Conversely, in the event the United States finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.  If the Court rejects the Agreement, all the provisions of the

3

Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

### Relevant Considerations

4.     The United States enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.     the Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Offices the conduct described in the attached Statement of Facts;

b.     the Company received credit for its cooperation with the United States' investigation, including: conducting a thorough internal investigation, making regular factual presentations to the Offices, voluntarily making employees available for interviews, producing documents to the United States, and collecting, analyzing, and organizing voluminous evidence and information for the Offices;

c.     by the completion of the investigation, the Company provided to the Offices all relevant facts, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Offices prior to the Agreement;

d.     the Company engaged in remedial measures, including the following:  of the two primary employees who engaged in the misconduct and who

4

remained with the Company when the Company learned of the misconduct, one is no longer with the Company and the other, the former Chief Executive Officer, has resigned as CEO and Chairman of the Board; the Company has altered its board structure to ensure that the former CEO does not control the board; the Company has terminated any and all relationships with corrupt and questionable third parties; stopped all politically-related payments to its employees, (including but not limited to payments treated as "marketing advances") resulting in a cessation of these expenditures; hired and/or designated a full-time Chief Governance and Compliance Officer, with authority to raise issues directly to the CEO; engaged an independent company to design a new compliance program; created a whistleblower email system; and training its workforce regarding political contributions.

      e.    the Company has committed to continuing to enhance its compliance program and internal controls, including continuing to ensure that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program) and amending their corporate tax returns as necessary;

      f.    based on the Company's remediation and the state of its compliance program, and the Company's agreement to report to the United States as

set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the United States determined that an independent compliance monitor was unnecessary;

g.      the nature and seriousness of the offense conduct, which lasted for years, was carried out by employees at the highest level of the organization, including its CEO and another high-level executive, involved hundreds of thousands of dollars in illegal corporate and conduit campaign contributions, and improper tax and accounting treatment of the reimbursements to Company employees;

h.      the prior investigations of the Company and its employees by the Federal Bureau of Investigation, the United States Attorney's Office for the Western District of Texas, and the Cameron County District Attorney's Office;

i.      the Company has agreed to continue to cooperate with the United States in any ongoing investigation of individuals or other companies; and

j.      accordingly, despite the nature and seriousness, pervasiveness, and scope of the offense conduct, due to the ability of the Offices to prosecute the culpable individual wrongdoers, the significant collateral consequences that a guilty plea would cause, the significant cooperation and remediation undertaken by the Company, the avoidance of a penalty that would substantially jeopardize the continued viability of the Company, and the other considerations outlined in (a) through (i) above, the Offices have determined that a deferred prosecution agreement

6

and a fine of $1,600,000 is sufficient but not greater than necessary to achieve the purposes described in 18 U.S.C. § 3553.

## Future Cooperation and Disclosure Requirements

5.      The Company shall, subject to applicable law and regulations, cooperate fully with the United States in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the United States at any time during the Term, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in paragraph 3.  At the request of the United States, the Company shall also cooperate fully with other law enforcement and regulatory authorities and agencies in any investigation of the Company or its present or former subsidiaries, affiliates, officers, directors, employees, agents, and consultants, or any other party, in any and all matters under investigation by the United States at any time during the Term.  The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a.      The Company shall, subject to applicable law and regulations, truthfully disclose all factual information not protected by a valid claim of

7

attorney-client privilege or attorney work product doctrine with respect to its activities, those of its present and former subsidiaries, affiliates, directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the United States may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the United States, upon request, any document, record or other tangible evidence about which the United States may inquire of the Company.

b.      Upon request of the United States, the Company shall designate knowledgeable employees, agents or attorneys to provide to the United States the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the United States, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall

8

include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

        d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the United States pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities, of such materials as the United States, in their sole discretion, shall deem appropriate.

        6.     In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FECA or other U.S. federal law, the Company shall promptly report such evidence or allegation to the United States.

## **Payment of Monetary Penalty**

7.      The United States and the Company agree that Title 52, United States Code, Section 30109 establishes the potential monetary penalties for this conduct. The parties further agree that based on the Company's conduct, $1,600,000 is appropriate.  The Company agrees to pay a fine in the amount of $1,600,000.  The Company will pay $1,000,000 to the United States Treasury within ten business days of the acceptance by the United States District Court of this agreement and its attachments, and it will pay $300,000 on the first and second anniversaries of the date of the first payment. The Company and the United States agree that this amount is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 above, and in consideration of imposing an amount that will avoid substantially jeopardizing the continued viability of the Company.  Furthermore, nothing in this agreement shall be deemed an agreement by the United States that $1,600,000 is the maximum amount that may be imposed in any future prosecution, and the United States is not precluded from arguing in any future prosecution that the Court should impose a higher penalty or fine, although the United States agree that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The

Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this payment amount. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to amounts that the Company pays pursuant to this Agreement, nor is this payment subject to joint and several liability with any penalty imposed on James Dannenbaum individually.

## Conditional Release from Liability

8.      Subject to Paragraphs 13-17, the Offices agree, except as provided in this Agreement and in the plea agreement between the Offices and James Dannenbaum dated October 31, 2019, that they will not bring any criminal or civil case against the Company or any of its direct or indirect subsidiaries, or joint ventures relating to any of the conduct concerning the conduct described in the attached Statement of Facts or the Information filed pursuant to this Agreement. The United States, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

11

a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

c.     The Company understands and acknowledges that this Agreement is contingent upon the entry of a guilty plea by James Dannenbaum to the Plea Agreement dated October 31, 2019.  If the Plea Agreement is not entered, this Agreement and any proceedings pursuant to this Agreement shall be withdrawn or voided at the sole discretion of the United States

## Corporate Compliance Program

9.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FECA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.  In order to address any deficiencies in its internal accounting controls, policies, and

procedures, the Company represents that it has undertaken, and will continue to

undertake in the future, in a manner consistent with all of its obligations under this

Agreement, a review of its existing internal accounting controls, policies, and

procedures regarding compliance with the FECA and other applicable anti-

corruption laws.  Where necessary and appropriate, the Company agrees to adopt a

new compliance program, or to modify its existing one, including internal controls,

compliance policies, and procedures in order to ensure that it maintains: (a) an

effective system of internal accounting controls designed to ensure the making and

keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-

corruption compliance program that incorporates relevant internal accounting

controls, as well as policies and procedures designed to effectively detect and deter

violations of the FECA and other applicable anti-corruption laws.  The compliance

program, including the internal accounting controls system, will include, but not be

limited to, the minimum elements set forth in Attachment C.

## **Corporate Compliance Reporting**

10.    The Company agrees that it will report to the United States annually

during the Term regarding remediation and implementation of the compliance

measures described in Attachment C.  These reports will be prepared in accordance

with Attachment D.

## **Deferred Prosecution**

11.     In consideration of the undertakings agreed to by the Company herein, the United States agrees that any prosecution of the Company for the conduct described in the attached Statement of Facts or Information filed pursuant to this Agreement be and hereby is deferred for the Term.  This paragraph does not provide any protection against prosecution for any crimes made in the future by the Company or by any of its officers, directors, employees, agents or consultants, whether or not disclosed by the Company pursuant to the terms of this Agreement.

12.     The United States further agrees that if the Company fully complies with all of its obligations under this Agreement, the United States will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within one month of the Agreement's expiration, the United States shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1 and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.

## **Breach of the Agreement**

13.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false,

incomplete, or misleading information, including in connection with its disclosure

of information about individual culpability; (c) fails to cooperate as set forth in

Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance

program as set forth in Paragraphs 9-10 of this Agreement and Attachment C; (e)

commits any acts that, had they occurred within the jurisdictional reach of the

FECA, would be a violation of the FECA; or (f) otherwise fails to completely

perform or fulfill each of the Company's obligations under the Agreement,

regardless of whether the United States becomes aware of such a breach after the

Term is complete, the Company shall thereafter be subject to prosecution for any

federal criminal violation of which the United States has knowledge, including, but

not limited to, the charges in the Information described in Paragraph 1, which may

be pursued by the United States in the U.S. District Court for the Southern District

of Texas or any other appropriate venue.  Determination of whether the Company

has breached the Agreement and whether to pursue prosecution of the Company

shall be in the United States' sole discretion.  Any such prosecution may be

premised on information provided by the Company or its personnel.  Any such

prosecution relating to the conduct described in the attached Statement of Facts or

relating to conduct known to the United States prior to the date on which this

Agreement was signed that is not time-barred by the applicable statute of

limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the United States is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

14.     In the event the United States determines that the Company has breached this Agreement, the United States agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the United States in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to

address and remediate the situation, which explanation the United States shall consider in determining whether to pursue prosecution of the Company.

15.     In the event that the United States determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the United States, or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the United States against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the United States.

17

16.     The Company acknowledges that the United States has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

17.     Thirty days prior to the end of the period of deferred prosecution specified in this Agreement, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the United States that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**Sale, Merger, or Other Change in Corporate Form of Company**

18.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or

18

to the operations of any subsidiaries or affiliates involved in the conduct described

in the attached Statement of Facts, as they exist as of the date of this Agreement,

whether such sale is structured as a sale, asset sale, merger, transfer, or other

change in corporate form, it shall include in any contract for sale, merger, transfer,

or other change in corporate form a provision binding the purchaser, or any

successor in interest thereto, to the obligations described in this Agreement.  The

purchaser or successor in interest must also agree in writing that the United States'

ability to breach under this Agreement is applicable in full force to that entity.  The

Company agrees that the failure to include these provisions in the transaction will

make any such transaction null and void.  The Company shall provide notice to the

United States at least thirty days prior to undertaking any such sale, merger,

transfer, or other change in corporate form.  If the United States notifies the

Company prior to such transaction (or series of transactions) that it has determined

that the transaction(s) has the effect of circumventing or frustrating the

enforcement purposes of this Agreement, as determined in the sole discretion of

the United States, the Company agrees that such transaction(s) will not be

consummated.  In addition, if at any time during the Term the United States

determines in its sole discretion that the Company has engaged in a transaction(s)

that has the effect of circumventing or frustrating the enforcement purposes of this

Agreement, it may deem it a breach of this Agreement pursuant to Paragraphs 20-24 of this Agreement.  Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the United States.

## Public Statements by Company

19.    The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 13-17 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the

sole discretion of the United States.  If the United States determines that a public

statement by any such person contradicts in whole or in part a statement contained

in the attached Statement of Facts, the United States shall so notify the Company,

and the Company may avoid a breach of this Agreement by publicly repudiating

such statement(s) within five business days after notification.  The Company shall

be permitted to raise defenses and to assert affirmative claims in other proceedings

relating to the matters set forth in the attached Statement of Facts provided that

such defenses and claims do not contradict, in whole or in part, a statement

contained in the attached Statement of Facts.  This Paragraph does not apply to any

statement made by any present or former officer, director, employee, or agent of

the Company in the course of any criminal, regulatory, or civil case initiated

against such individual, unless such individual is speaking on behalf of the

Company.

20.     The Company agrees that if it, or any of its direct or indirect

subsidiaries or affiliates issues a press release or holds any press conference in

connection with this Agreement, the Company shall first consult with the United

States to determine (a) whether the text of the release or proposed statements at the

press conference are true and accurate with respect to matters between the United

States, and the Company; and (b) whether the United States has any objection to

21

the release.  If the United States does not respond expeditiously, the Company may proceed accordingly.

21.    The United States agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the United States is not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

22.    This Agreement is binding on the Offices, but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

## Notice

23.    Any notice to the United States under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or

registered or certified mail, addressed to Ralph Imperato, Deputy Criminal Chief,

U.S. Attorney's Office for the Southern District of Texas, 1000 Louisiana, 23rd

Floor, Houston, Texas, 77002.  Any notice to the Company under this Agreement

shall be given by personal delivery, overnight delivery by a recognized delivery

service, or registered or certified mail, addressed to Michel Maksoud and Chris

Sallese at 3100 West Alabama, Houston, Texas, 77098.  Notice shall be effective

upon actual receipt by the Office or the Company.

## **Complete Agreement**

24.    This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the United States.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the United States, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR THE COMPANY:**

Date: 11-22-2019          By: _____

Michel Maksoud
President & CEO
Dannenbaum Engineering Corp.

Date: 11-22-2019          By: _____

Johnny Sutton
Ashcroft Sutton Reyes, LLP

**FOR THE UNITED STATES OF AMERICA:**

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
United States Department of Justice

BY: _____
Jessica C. Harvey
Trial Attorney

TIM S. BRALEY
Attorney for the United States
United States Attorney's Office
Southern District of Texas

_____
Carolyn Ferko
John Pearson
Assistant United States Attorneys

24

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Dannenbaum Engineering Corporation (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Executive Officer and

25

President for the Company and that I have been duly authorized by the Company

to execute this Agreement on behalf of the Company.

Dannenbaum Engineering Corporation

Date: 11-22-2019          By: _____
                              Michel Maksoud
                              Chief Executive Officer & President

## CERTIFICATE OF COUNSEL

I am counsel for Dannenbaum Engineering Corporation (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company's Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Chief Governance and Compliance Officer of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 11-22-2019    By: 

Johnny Sutton
Ashcroft Sutton Reyes, LLC
Counsel for Dannenbaum Engineering
Corporation

27

# **ATTACHMENT A**

# **STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Southern District of Texas (the "Office") and the United States Department of Justice, Criminal Division, Public Integrity Section (the "Public Integrity Section") (collectively, the "Offices") and the defendants Dannenbaum Engineering Corporation (DEC) and Engineering Holding Corporation (EHC) (collectively, the "Company").   The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.   Certain of the facts herein are based on information obtained from third parties by the Offices through their investigation and described to the Company.   Should the Offices pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the Criminal Information attached to this Agreement.

1

### Relevant Individuals and Entities

1.      Dannenbaum Engineering Corporation ("DEC") was a privately owned civil engineering firm headquartered in Houston, Texas, within the Southern District of Texas, and with satellite locations in Austin, Dallas, El Paso, Ft. Worth, San Antonio, Laredo, and McAllen.   Engineering Holding Corporation (EHC) was the parent company of DEC.

2.      James D. Dannenbaum (hereinafter "Dannenbaum") was a resident of Houston, Texas, located in the Southern District of Texas.   Dannenbaum was the largest individual shareholder of EHC and DEC, as well as President and Chief Executive Officer of DEC.   Former Employee A was a resident of McAllen, Texas, within the Southern District of Texas.   Former Employee A served as the lead project manager on most of DEC's South Texas work.

3.      In 2015, 2016, and 2017, the Federal Election Campaign Act (FECA) limited contributions from any one individual to any one federal candidate's primary and general election campaigns to $2,700 per campaign, for a total of $5,400.   In 2015, 2016, and 2017, the FECA limited contributions from any one individual to a particular political action committee (PAC) to a total of $5,000 in a calendar year.

## Overview of the Scheme

4.      From at least March 2015 through at least April 2017, the Company, Dannenbaum, and Former Employee A knowingly and willfully made contributions to a candidate for federal office in the names of other persons, aggregating $25,000 and more during a calendar year.

5.      The object of the scheme was for DEC, Dannenbaum, and Former Employee A to gain access to and potential influence with various candidates for federal office, including candidates for United States President, United States Senator, and Member of the United States House of Representatives, by secretly funneling contributions through straw donors, all while concealing from the candidates, their committees, the public, the FEC, and law enforcement the true source of such money.

6.      In furtherance of the scheme, Dannenbaum and Former Employee A directly and indirectly solicited DEC employees and their family members for contributions to various federal candidates and their committees, with the understanding that DEC, Dannenbaum, Former Employee A, and others would provide the funds for the contributions or would reimburse the conduit donors in full, including by causing funds to be disbursed from DEC's corporate bank accounts as an advance or a reimbursement for the conduits' contributions.

7.     In addition, Dannenbaum and Former Employee A collected checks and contribution forms from the conduit contributors, or had checks and contribution forms collected on their behalf by Dannenbaum's Executive Assistant; at times, completed donor cards and other campaign forms for the conduit contributors; and either delivered or caused to be delivered the checks and forms to the various federal campaigns identified below.

8.     To complete the reimbursements, Dannenbaum directly and indirectly caused DEC to use its corporate funds to reimburse the conduit contributors, including Dannenbaum and Former Employee A, for the campaign contributions that they made.   Dannenbaum also routinely directed DEC funds to his own account to reimburse himself for his own advances or reimbursements to such conduits.

9.     DEC, Dannenbaum, Former Employee A, and others treated these payments as compensation to the relevant employee, when in reality they were reimbursements.   As a result, to avoid subjecting the conduit employees to income tax on such reimbursements, DEC "grossed up" the amount of reimbursements paid to the conduit employees by adding the applicable income tax.

10.    From 2015 through 2017, DEC, Dannenbaum, and Former Employee A caused 31 individuals to contribute $323,300 to federal political candidates and committees.   They caused contributions to 24 separate campaigns and committees,

for a total of 95 conduit contributions.   Each conduit was reimbursed with corporate money.   At no point did DEC, Dannenbaum, or Former Employee A reveal to the candidate or his or her committee that the Company was the true source of these funds.

11.   The contributions are detailed below:

| Year | Conduits | Total Contributed | Campaigns & Committees | Contributions |
|------|----------|-------------------|------------------------|---------------|
| 2015 | 15 | $170,800 | 8 | 42 |
| 2016 | 26 | $130,000 | 15 | 44 |
| 2017 | 4 | $22,500 | 3 | 9 |

a.   "Committee A" was an independent expenditure-only political committee, or "Super PAC," that received contributions made for the purpose of influencing elections for federal office, including for the office of President of the United States.   In or about 2015, Dannenbaum solicited Former Employee A and other DEC employees to contribute to Committee A, representing that he would reimburse them in full for their contributions.   In or about 2015, at Dannenbaum's solicitation and direction, Former Employee A and eight DEC employees and their family members each contributed to Committee A in their own names, for a total of $90,000.   Dannenbaum and Former Employee A reimbursed each contributor

using funds derived from the corporate bank account of DEC.   Dannenbaum did

not reveal to Committee A that DEC was the true source of these funds.

b.   "Candidate B" was a candidate for the office of President of the

United States.   "Committee B" was Candidate B's principal campaign committee.

In or about 2015, Dannenbaum solicited Former Employee A and DEC employees

to contribute to Committee B, representing that he would reimburse them in full for

their contributions.   In or about 2015, at Dannenbaum's solicitation and direction,

eleven DEC employees and their family members each contributed to Committee B

in their own names, for a total of $48,600.   Dannenbaum reimbursed each

contributor using funds derived from the corporate bank account of DEC.

Dannenbaum did not reveal to Committee B that DEC was the true source of these

funds.   Additionally, in or about 2016, Dannenbaum solicited DEC employees to

contribute to Committee B, representing that he would reimburse them in full for

their contributions.   In or about 2016, at Dannenbaum's solicitation and direction,

eight DEC employees and their family members each contributed to Committee B

in their own names, for a total of $21,600.   Dannenbaum reimbursed the

contributors for their contributions using funds derived from the corporate bank

account of DEC.   Dannenbaum did not reveal to Committee B that DEC was the

true source of these funds.

c.   "Candidate C" was a candidate for the office of United States

Senator.   "Committee C" was Candidate B's principal campaign committee.   In or about 2015, Dannenbaum solicited DEC employees to contribute to Committee C, representing that he would reimburse them in full for their contributions.   In or about 2015, at Dannenbaum's solicitation and direction, four DEC employees and their family members each contributed to Committee C in their own names, for a total of $10,800.   Dannenbaum reimbursed each contributor using funds derived from the corporate bank account of DEC.   Dannenbaum did not reveal to Committee C that DEC was the true source of these funds.

d.   "Candidate D" was a candidate for the United States House of Representatives.   "Committee D" was Candidate D's principal campaign committee.   In or about 2015, Dannenbaum solicited DEC employees to contribute to Committee D, representing that he would reimburse them in full for their contributions.   In or about 2015, at Dannenbaum's solicitation and direction, three DEC employees and their family members each contributed to Committee D in their own names, for a total of $8,100.   Dannenbaum reimbursed each contributor using funds derived from the corporate bank account of DEC.   Dannenbaum did not reveal to Committee D that DEC was the true source of these funds.   In addition, in or about 2016, Dannenbaum solicited DEC employees to contribute to Committee D, representing that he would reimburse them in full for their contributions.   In or about 2016, at Dannenbaum's solicitation and direction, one employee of DEC

contributed to Committee D in his or her own name, for a total of $2,700. Dannenbaum reimbursed the contributor using funds derived from the corporate bank account of DEC.   Dannenbaum did not reveal to Committee D that DEC was the true source of these funds.

    e. "Candidate E," referred to elsewhere as "Candidate #3-2017," was a candidate for the United States House of Representatives.   "Committee E," referred to elsewhere as "Committee #3-2017," was Candidate E's principal campaign committee.   In or about 2015, Former Employee A contributed to Committee E in his or her own name, for a total of $4,200.   Dannenbaum reimbursed Former Employee A using funds derived from the corporate bank account of DEC.   Dannenbaum and Former Employee A did not reveal to Committee E that DEC was the true source of these funds.   In or about February 2017, at Dannenbaum's solicitation and direction, Former Employee A contributed $2,500 to Committee E and was reimbursed with corporate funds.   Dannenbaum and Former Employee A did not reveal to Committee E that DEC was the true source of these funds.

    f. "Candidate F" was a candidate for the United States House of Representatives.   "Committee F" was Candidate F's principal campaign committee.   In or about 2015, Former Employee A contributed to Committee F in his or her own name, for a total of $3,700.   Dannenbaum reimbursed Former

Employee A using funds derived from the corporate bank account of DEC. Dannenbaum and Former Employee A did not reveal to Committee F that DEC was the true source of these funds.

g.   "Candidate G" was a candidate for the office of President of the United States.   "Committee G" was Candidate G's principal campaign committee. In or about 2015, Former Employee A contributed to Committee G in his or her own name, for a total of $2,700.   Dannenbaum reimbursed Former Employee A using funds derived from the corporate bank account of DEC.   Dannenbaum and Former Employee A did not reveal to Committee G that DEC was the true source of these funds.   In addition, in or about 2016, Dannenbaum and Former Employee A solicited DEC employees to contribute to Committee G, representing that he would reimburse them in full for their contributions.   In or about 2016, at Dannenbaum's and Former Employee A's solicitation and direction, ten DEC employees and their family members each contributed to Committee G in their own names, for a total of $27,000.   Dannenbaum and Former Employee A reimbursed the contributors for their contributions using funds derived from the corporate bank account of DEC. Dannenbaum and Former Employee A did not reveal to Committee G that DEC was the true source of these funds.

h.   "Candidate H" was a candidate for the office of United States Senator.   "Committee H" was Candidate H's principal campaign committee.   In

or about 2015, Dannenbaum solicited DEC employees to contribute to Committee H, representing that he would reimburse them in full for their contributions. In or about 2015, at Dannenbaum's solicitation and direction, one employee of DEC contributed to Committee H in his or her own name, for a total of $2,700. Dannenbaum reimbursed the contributor using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee H that DEC was the true source of these funds.

   i. "Candidate I" was a candidate for Member of the United States House of Representatives. "Committee I" was a joint fundraising committee of Candidate I. In or about 2016, Dannenbaum solicited DEC employees to contribute to Committee I, representing that he would reimburse them in full for their contributions. In or about 2016, at Dannenbaum's solicitation and direction, five DEC employees and their family members each contributed to Committee I in their own names, for a total of $25,000. Dannenbaum reimbursed the contributors for their contributions using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee I that DEC was the true source of these funds.

   j. "Candidate J" was a candidate for the United States House of Representatives. "Committee J" was Candidate J's principal campaign committee. In or about 2016, Dannenbaum solicited DEC employees to contribute to Committee

J, representing that he would reimburse them in full for their contributions.   In or about 2016, at Dannenbaum's solicitation and direction, four DEC employees and their family members each contributed to Committee J in their own names, for a total of $10,800.   Dannenbaum reimbursed the contributors for their contributions using funds derived from the corporate bank account of DEC.   Dannenbaum did not reveal to Committee J that DEC was the true source of these funds.

       k.   "Candidate K" was a candidate for the United States House of Representatives.   "Committee K" was Candidate K's principal campaign committee.   In or about 2016, Dannenbaum solicited DEC employees to contribute to Committee K, representing that he would reimburse them in full for their contributions.   In or about 2016, at Dannenbaum's solicitation and direction, four DEC employees and their family members each contributed to Committee K in their own names, for a total of $10,800.   Dannenbaum reimbursed the contributors for their contributions using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee K that DEC was the true source of these funds.   In addition, in or about 2016, Dannenbaum solicited DEC employees to contribute to Committee K, representing that he would reimburse them in full for their contributions.

       l.   "Candidate L" was a candidate for the United States House of Representatives.   "Committee L" was Candidate L's principal campaign

committee. In or about 2016, Dannenbaum solicited DEC employees to contribute to Committee L, representing that he would reimburse them in full for their contributions. In or about 2016, at Dannenbaum's solicitation and direction, two DEC employees and their family members each contributed to Committee L in their own names, for a total of $5,400. Dannenbaum reimbursed the contributors for their contributions using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee L that DEC was the true source of these funds.

m. "Candidate M" was a candidate for Member of the United States House of Representatives. "Committee M" was Candidate M's principal campaign committee. In or about 2016, Dannenbaum solicited DEC employees to contribute to Committee M, representing that he would reimburse them in full for their contributions. In or about 2016, at Dannenbaum's solicitation and direction, two DEC employees and their family members each contributed to Committee M in their own names, for a total of $5,400. Dannenbaum reimbursed the contributors for their contributions using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee M that DEC was the true source of these funds.

n. "Candidate N" was a candidate for the United States House of Representatives. "Committee N" was Candidate N's principal campaign

12

committee.   In or about 2016, at Dannenbaum's and Former Employee A's solicitation and direction, Former Employee A and one other DEC employee each contributed to Committee N in their own names, for a total of $5,200. Dannenbaum and Former Employee A reimbursed the contributors using funds derived from the corporate bank account of DEC.   Dannenbaum and Former Employee A did not reveal to Committee N that DEC was the true source of these funds.

o.   "Committee O" was an independent expenditure-only political committee, or "Super PAC," that received contributions made for the purpose of influencing elections for federal office.   In or about 2016, at Former Employee A's solicitation and direction, one employee of DEC contributed to Committee O in his or her own name, for a total of $5,000.   Dannenbaum reimbursed the contributor using funds derived from the corporate bank account of DEC.   Dannenbaum did not reveal to Committee O that DEC was the true source of these funds.

p.   "Candidate P" was a candidate for the United States House of Representatives.   "Committee P" was Candidate P's principal campaign committee.   In or about 2016, Dannenbaum solicited DEC employees to contribute to Committee P, representing that he would reimburse them in full for their contributions.   In or about 2016, at Dannenbaum's solicitation and direction, one employee of DEC contributed to Committee P in his or her own name, for a total of

$2,700. Dannenbaum reimbursed the contributor for using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee P that DEC was the true source of these funds.

q. "Candidate Q" was a candidate for the United States House of Representatives. "Committee Q" was Candidate Q's principal campaign committee. In or about 2016, Former Employee A contributed to Committee Q in his or her own name, for a total of $2,700. Dannenbaum reimbursed Former Employee A using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee Q that DEC was the true source of these funds.

r. "Candidate R" was a candidate for the office of President of the United States. "Committee R" was Candidate R's principal campaign committee. In or about 2016, Dannenbaum solicited DEC employees to contribute to Committee R, representing that he would reimburse them in full for their contributions. In or about 2016, at Dannenbaum's solicitation and direction, one employee of DEC contributed to Committee R in his or her own name, for a total of $2,700. Dannenbaum reimbursed the contributor using funds derived from the corporate bank account of DEC. Dannenbaum did not reveal to Committee R that DEC was the true source of these funds.

s. "Committee S" was a qualified political action committee that

14

received contributions made for the purpose of influencing elections for federal office.   In or about 2016, Former Employee A contributed to Committee S in his or her own name, for a total of $2,000.   Dannenbaum and Former Employee A reimbursed each contributor using funds derived from the corporate bank account of DEC.   Dannenbaum and Former Employee A did not reveal to Committee S that DEC was the true source of these funds.

       t.    "Candidate T" was a candidate for the office of United States Senator.   "Committee T" was Candidate T's principal campaign committee.   In or about 2016, Former Employee A contributed to Committee T in his or her own name, for a total of $1,000.   Dannenbaum and Former Employee A reimbursed the contributor using funds derived from the corporate bank account of DEC. Dannenbaum and Former Employee A did not reveal to Committee T that DEC was the true source of these funds.

       u.    "Candidate U," referred to elsewhere as "Candidate #1-2017," was a candidate for the United States House of Representatives.   "Committee U," referred to elsewhere as "Committee #1-2017," was Candidate U's principal campaign committee.   In or about 2017, Dannenbaum and Former Employee A solicited DEC employees to contribute to Committee U, representing that they would reimburse them in full for their contributions.   In or about 2017, at Dannenbaum's and Former Employee A's solicitation and direction, Former Employee A and three

15

employees of DEC contributed to Committee U in their own names, for a total of $10,000. Dannenbaum and Former Employee A reimbursed each contributor using funds derived from the corporate bank account of DEC. Dannenbaum and Former Employee A did not reveal to Committee U that DEC was the true source of these funds.

v. "Candidate V," referred to elsewhere as "Candidate #2-2017," was a candidate for the office of United States Senator. "Committee V," referred to elsewhere as "Committee #2-2017," was Candidate V's principal campaign committee. In or about 2017, Dannenbaum and Former Employee A solicited DEC employees to contribute to Committee V, representing that he would reimburse them in full for their contributions. In or about 2017, at Dannenbaum's and Former Employee A's solicitation and direction, Former Employee A and three employees of DEC contributed to Committee V in their own names, for a total of $10,000. Dannenbaum and Former Employee A reimbursed each contributor using funds derived from the corporate bank account of DEC. Dannenbaum and Former Employee A did not reveal to Committee V that DEC was the true source of these funds.

12. On February 14, 2017, Dannenbaum and Former Employee A discussed their plan to use corporate funds to contribute a total of $10,000 to the reelection campaign of Candidate U, that is, Candidate #1-2017, and a total of

$10,000 to the reelection campaign of Candidate V, that is, Candidate #2-2017. During the conversation, Dannenbaum stated to Former Employee A, "For the federal, you know you'll have to split it up." Former Employee A replied, "Yeah, I was gonna make sure I get it split up right." Defendant replied, "Yeah-I-I normally have all the checks together and then staple, you know, my business card . . . to the checks so that-so there's no confusion about . . . where they came from."

13. In or about February 2017, Dannenbaum submitted a "Check Request Form" to DEC's finance office, directing that a $21,000 payment be issued to Former Employee A. On the form, Dannenbaum indicated that the check was to be a payment for a "Marketing Advance."

14. Shortly thereafter, Dannenbaum caused Former Employee A to receive a DEC corporate check in the amount of $21,000 with the abbreviation "MKT ADV" noted on the check stub. After receiving this corporate check, Former Employee A, in turn, wrote three personal checks to three DEC employees. The amount of these checks mirrored the total amount that each DEC employee contributed to the campaigns identified by Dannenbaum and Former Employee A. FEC records show that Former Employee A and the three DEC employees' February 2017 campaign contributions totaled $10,000 each to the two campaigns.

15. After the FBI conducted search warrants at multiple DEC locations in April 2017, and after the FBI interviewed an employee from the external audit and

accounting firm hired by EHC and DEC to prepare its tax returns, these individuals began to prepare EHC's draft 2016 corporate tax return.   In November and December 2017, these individuals interviewed Defendant regarding whether DEC had made any politically related payments.   The external audit and accounting team also asked DEC via a written questionnaire, "Did the company pay or incur any amount, either directly or indirectly, related to participation in, or intervention in, any political campaign on behalf of (or in opposition to) any candidate for public office?" Defendant willfully and falsely responded, "No."

ATTACHMENT B

## **CERTIFICATE OF CORPORATE RESOLUTIONS**

## **DANNENBAUM ENGINEERING CORPORATION**

WHEREAS, Dannenbaum Engineering Corporation (the "Company") has been engaged in discussions with the United States Attorney's Office for the Southern District of Texas (the "Office") and the United States Department of Justice, Criminal Division, Public Integrity Section (the "Public Integrity Section") (collectively, the "United States") regarding issues arising in relation to certain violations of the Federal Election Campaign Act (FECA); and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the United States; and

WHEREAS, the Company's Chief Executive Officer & President, Michel Maksoud, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the United States;

Therefore, the Board of Directors has RESOLVED that:

1. The Company (a) acknowledges the filing of the one-count Information charging the Company with Title 52, United States Code, Sections 30122 and 30109, waives indictment on such charges and enters into a deferred prosecution agreement

1

with the United States; and (c) agrees to pay, jointly with Engineering Holding

Corporation,   $1,600,000 to the United States Treasury with respect to the conduct

described in the Information;

2.       The Company accepts the terms and conditions of this Agreement,

including, but not limited to, (a) a knowing waiver of its rights to a speedy trial

pursuant to the Sixth Amendment to the United States Constitution, Title 18, United

States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a

knowing waiver for purposes of this Agreement and any charges by the United States

arising out of the conduct described in the attached Statement of Facts of any

objection with respect to venue and consents to the filing of the Information, as

provided under the terms of this Agreement, in the United States District Court for

the Southern District of Texas; and (c) a knowing waiver of any defenses based on

the statute of limitations for any prosecution relating to the conduct described in the

attached Statement of Facts or relating to conduct known to the United States prior

to the date on which this Agreement was signed that is not time-barred by the

applicable statute of limitations on the date of the signing of this Agreement;

3.       The Chief Executive Officer and President, Michel Maksoud, is hereby

authorized, empowered and directed, on behalf of the Company, to execute the

Deferred Prosecution Agreement substantially in such form as reviewed by this

2

Board of Directors at this meeting with such changes as the Company's Chief Executive Officer and President, Michel Maksoud, may approve;

4.     The Company's Chief Executive Officer and President, Michel Maksoud, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.     All of the actions of the Company's Chief Executive Officer and President, Michel Maksoud, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.


Date: _November 21, 2019_     By: _____

Corporate Secretary
Dannenbaum Engineering Corporation

3

## ENGINEERING HOLDING CORPORATION

WHEREAS, Engineering Holding Corporation (the "Company") has been engaged in discussions with the United States Attorney's Office for the Southern District of Texas (the "Office") and the United States Department of Justice, Criminal Division, Public Integrity Section (the "Public Integrity Section") (collectively, the "United States") regarding issues arising in relation to certain violations of the Federal Election Campaign Act (FECA); and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the United States; and

WHEREAS, the Company's Board of Directors member Michel Maksoud, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the United States;

Therefore, the Board of Directors has RESOLVED that:

1.     The Company (a) acknowledges the filing of the one-count Information charging the Company with Title 52, United States Code, Sections 30122 and 30109, waives indictment on such charges and enters into a deferred prosecution agreement with the United States; and (c) agrees to pay, jointly with Dannenbaum Engineering

4

Corporation, $1,600,000 to the United States Treasury with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Texas; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the United States prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      EHC Board Member Michel Maksoud is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as Michel Maksoud, may approve;

5

4.    EHC Board Member Michel Maksoud, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.    All of the actions of the EHC Board Member Michel Maksoud, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _November 21, 2019_    By: _Betty Lozada_____
                                 Corporate Secretary
                                 Engineering Holding Corporation

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Federal Election Campaign Act ("FECA"), 52 U.S.C. §§ 30101 *et seq.*, and other applicable anti-corruption laws, Engineering Holding Corporation and Dannenbaum Engineering Corporation (collectively, the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FECA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

1

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management

provide strong, explicit, and visible support and commitment to its corporate policy

against violations of the anti-corruption laws and its compliance code.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and

visible corporate policy against violations of the FECA and other applicable anti-

corruption laws, which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and

procedures designed to reduce the prospect of violations of the anti-corruption laws

and the Company's compliance code, and the Company will take appropriate

measures to encourage and support the observance of ethics and compliance

policies and procedures against violation of the anti-corruption laws by personnel

at all levels of the Company. These policies and procedures shall apply to all

directors, officers, and employees and, where necessary and appropriate, outside

parties acting on behalf of the Company, including but not limited to, agents and

intermediaries, consultants, representatives, distributors, teaming partners,

contractors and suppliers, consortia, and joint venture partners (collectively,

"agents and business partners"). The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company. Such policies and procedures shall address:

    a.   gifts;

    b.   hospitality, entertainment, and expenses;

    c.   customer travel;

    d.   political contributions;

    e.   charitable donations and sponsorships;

    f.   facilitation payments; and

    g.   solicitation and extortion.

4.   The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

    a.   transactions are executed in accordance with management's general or specific authorization;

    b.   transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or

any other criteria applicable to such statements, and to maintain accountability for assets;

        c.     access to assets is permitted only in accordance with management's general or specific authorization; and

        d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

     5.    The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

     6.    The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure

their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.    The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.    The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the

5

Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's compliance code, policies, and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's compliance code, policies, and procedures.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's compliance code, policies, and procedures by the Company's directors, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

7

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.     seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

8

*Mergers and Acquisitions*

16.    The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FECA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.    The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.    train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

b.    where warranted, conduct an audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.    The Company will conduct periodic reviews and testing of its compliance code, policies, and procedures designed to evaluate and improve their

effectiveness in preventing and detecting violations of anti-corruption laws and the

Company's anti-corruption code, policies, and procedures, taking into account

relevant developments in the field and evolving international and industry

standards.

ATTACHMENT D

## **REPORTING REQUIREMENTS**

Engineering Holding Corporation and Dannenbaum Engineering Corporation (collectively, the "Company") agrees that it will report to the United States Attorney's Office for the Southern District of Texas and the Public Integrity Section (collectively, the "Offices") periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C. During this three-year period, the Company shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two (2) follow-up reviews and reports, as described below:

a.    By no later than one year from the date this Agreement is executed, the Company shall submit to the Offices a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies, and procedures for ensuring compliance with the FECA and other applicable anti-corruption laws, and the proposed scope of the subsequent reviews. The report shall be transmitted to Ralph Imperato, Deputy Criminal Chief, U.S. Attorney's Office for the Southern District of Texas, 1000 Louisiana, 23rd Floor, Houston, Texas, 77002.  The

Company may extend the time period for issuance of the report with prior written approval of the Offices.

  b.  The Company shall undertake at least two follow-up reviews and reports, incorporating the Offices' views on the Company's prior reviews and reports, to further monitor and assess whether the Company's policies and procedures are reasonably designed to detect and prevent violations of the FECA and other applicable anti-corruption laws.

  c.  The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Offices. The second follow-up review and report shall be completed and delivered to the Offices no later than thirty days before the end of the Term.

  d.  The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determines in its sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

2

e.    The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Offices.